# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x
ROBERT W. SEIDEN, Esq. Receiver for        :
SOUTHERN CHINA LIVESTOCK, INC.,            :      Case No. _____
                                           :
Plaintiff,                                 :
                                           :
                                           :      COMPLAINT
vs.                                        :
                                           :
SCHWARTZ, LEVITSKY, AND FELDMAN            :
LLP,                                       :
                                           :
                                           :      JURY TRIAL DEMANDED
Defendant.                                 :
-------------------------------------------------- x
```

Robert W. Seiden, Esq. Receiver for Southern China Livestock, Inc. files this Original Complaint (the "Complaint") against Defendant Schwartz, Levitsky, and Feldman LLP ("Defendant" or "SLF"), and alleges as follows:

## I.      PREFACE

1.      This action is filed to recover damages for the Southern China Livestock, Inc. ("SCLI") receivership estate from SLF based on its participation in a reverse takeover orchestrated by the former directors of Southern China Livestock, Inc. and others that injured the companies comprising Southern China Livestock, Inc.

## II.      PARTIES

2.      Plaintiff Robert W. Seiden, Esq. for Southern China Livestock, Inc., a Delaware company, was appointed by the Court of Chancery in the State of Delaware, Case no. 8851-VCN, in the action *In re Southern China Livestock, Inc. Litigation* (the "Receiver" or "Plaintiff"). A true and correct copy of the Order appointing the Receiver, Robert W Seiden, is attached hereto as **Exhibit A**; and a true and correct copy of the Receiver's Curriculum Vitae is attached hereto as **Exhibit B**.

1

3.     Defendant Schwartz, Levitsky, and Feldman is an accounting firm based in Toronto, Canada. Under Federal Rules of Civil Procedure 4(h), SLF may be served with process by mailing a true copy of the citation with an attached copy of this Complaint, by registered or certified mail, return-receipt requested, to SLF's registered agent in Delaware.

### III.     JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332 because the parties are not citizens of the same state and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claim occurred in the district. Specifically, SCLI is a Delaware entity and SLF contracted with a Delaware entity. In addition, as part of registering with the Public Company Accounting Oversight Board ("PCAOB"), SLF designated Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808 as its U.S. agent in Delaware.

### IV.     FACTUAL BACKGROUND

**A.     SCLI Corporation Formation and Lineage**

6.     On September 27, 2007, Expedite 4, Inc. ("Expedite") was incorporated in Delaware. On July 28, 2009, Southern China Livestock International, Inc. ("International") was incorporated in Nevada as a holding company for Jiangxi Yingtan Huaxin Livestock, Ltd. ("JYHL"). JYHL is a registered company in the People's Republic of China. JYHL's interest in International was held through Mayson International Services Limited (a British Virgin Islands company), Mayson Enterprise Services Limited (a British Virgin Islands company), Mayson Holdings Limited (a Hong Kong company), and Beijing Huaxin Tianying Livestock Technology, Ltd. ("BHTLT") (a China company). Within this company structure are seven (7) subsidiary companies in China that operate nineteen (19) hog farms.

7.      On March 29, 2010, Expedite acquired International through a reverse takeover transaction ("RTO"). In the RTO, Expedite acquired 100% of International's shares in exchange for 99.7% of Expedite's common stock. As a result, International owned all but 1,500 shares of Expedite.

8.      On July 9, 2010, Expedite filed for a change of name to Southern China Livestock, Inc. ("SCLI")

**B.      RTO & PPM**

9.      At the start of 2010, Expedite began SCLI's efforts to raise $10,000,000.00 through a private placement memorandum ("PPM"). Rodman and Renshaw LLC and Newbridge Securities Corporation served as the placement agents.

10.     As detailed in the PPM, the money raised was to be used to acquire hog farms in China and develop a fertilizer business. In May of 2010, SCLI filed a registration statement with the Securities Exchange Commission ("SEC"). Unfortunately, as of August 15, 2011, the registration statement was withdrawn.

**C.      SLF & the RTO**

11.     As part of the RTO, a PCAOB-registered auditor must conduct an independent audit and submit result in an audit opinion. Specifically, the audit must adhere to standards of the PCAOB and Generally Accepted Auditing Standards ("GAAS").

12.     SLF is an accounting firm based in Canada, with offices in Toronto and Montreal. SLF is registered with the Public Company Accounting Oversight Board ("PCAOB") in the United States.

13.     SLF was hired to conduct SCLI's audit and submit the required audit opinion (the "Audit Opinion"). SLF marketed themselves as experts in China-related businesses: having "extensive experience in doing financial due diligence of Chinese companies." (*See* www.slfa.ca)

In fact, SLF claims that a "number of the companies that SLF has represented have successfully listed on the North American Securities Exchanges." *Id.*

14.     SCLI hired SLF to replace its current auditor Gately & Associates, LLC. SLF agreed to conduct an audit of SCLI's finances between 2008 and September 30, 2009. SLF had full knowledge that this audit was performed in connection with the RTO and would be a part of the PPM.

15.     Based on SLF's own assertions, SLF was an expert in this type of audit and knew that companies and investors would rely on its opinion. The SCLI audit was not SLF's first audit of a Chinese company involved in a RTO; nor SLF's first involvement in fraud in an RTO. Specifically, SLF's audit clients China Automotive Systems, Inc. and HQ Sustainable Maritime Industries, Inc. were both determined to be committing fraud while SLF served as their audit counsel. In fact, SLF ended up as a defendant in another lawsuit due to their involvement in the fraud committed by China Automotive Systems, Inc. See *Nancy George, et al. v. China Automotive Systems, Inc., et al.*; Case 1:11-cv-07533-KBY in the United States District Court Southern District of New York.

16.     In producing the Audit Opinion, SLF audited "the consolidated balance sheets" and "the consolidated states of income and comprehensive income, stockholders' equity and cash flows." SLF made clear that it is "[o]ur responsibility [] to express an opinion on these consolidated financial statements based on our audits." *Id.*

17.     The Audit Opinion was purportedly done in accordance with GAAS and PCAOB standards. As SLF's admit in the Audit Opinion, according to the PCAOB standards, SLF was to "plan and perform an audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement." *Id.* Specifically, SLF described the audit process as "examining, on a test basis, evidence supporting the amounts and disclosures in the consolidated

financial statements." *Id.* In addition, SLF stated it was "assessing principles used and significant estimates made by management, as well as evaluate the overall financial statement presentation." *Id.*

18.    However, the actual audit was not conducted with adherence to GAAS and PCAOB standards. In the short 3-month window from being engaged at the end of November 2009 and signing-off on the audit in January 2010, the following are statements from SCLI and SLF employees on how the audit was conducted:

(a)    At the start of the audit, an SLF executive in December 2009 stated he "is very concerned about the speed of the audit" and that they "need more time";

(b)    On December 3, 2009, an SCLI representative stated the "company is very confused" and "we need to have a definitive plan";

(c)    As the audit progresses, SLF employee/agent states "local staffs (sic) are not familiar with the schedules since this is their first time to help";

(d)    On December 23, 2009, SLF manager states at the end of December that a "two weeks period is not sufficient to have a first year audit of a new client for two years to be done satisfactorily";

(e)    On January 8, 2010, an SLF manager asks Goldberg: "How can the audit be completed without a full set of complete file?" in an email describing that there "is a serious problem in the process of reviewing this file" because "SLF still does not have a complete file";

(f)    On January 13, 2010, days before SLF signs the Audit Opinion, Goldberg states to a SCLI executive that the lack of information form SCLI "is not a satisfactory situation" and that he is "very concerned at the slow pace that we are receiving the outstanding information" and it "will be very difficult to complete the audit [before his staff leaves China];" and

(g)    On January 14, 2010, Goldberg, SLF's lead auditor, just days before signing off on the audit describes the lack of documentation needed for the audit in January 2010 as an "unfortunate and extremely troubling dilemma" and that SCLI's "attitude troubles [him] greatly."

19.    Notwithstanding, on January 28, 2010, SLF concluded in its audit opinion that "[w]e believe that our audits provide a reasonable basis for our opinion." Finally, SLF proclaimed

– with full knowledge of its inclusion in the PPM and the investors' reliance – that "[i]n our opinion, these consolidated financial states referred to above present fairly, in all material respects, the financial position of Southern China Livestock International Inc." *Id.*

**D.    SLF'S Conflicted Position**

20.    In September 2009, prior to SLF being retained as the SCLI's independent auditor, Gerry Goldberg ("Goldberg") was working to broker investments opportunities in SCLI. As a partner at SLF, Goldberg was soliciting investments in SCLI, among other foreign companies. Despite the conflicted position of SLF and Goldberg, on November 25, 2009, SLF was retained to perform an independent audit of SCLI and Goldberg assumed the position of lead auditor. See **Exhibit C**, Engagement Letter between SCLI and SLF.

21.    SLF did not disclose its conflicted position to SCLI management or its audit committee. Instead, SLF rushed through an audit that contained many failures in procedure and signed an unqualified audit report on January 28, 2010.

**E.    Investment Money Raised**

22.    Based on the strength of the 2010 Audit Opinion, SCLI went on to raise a substantial amount of money from investors. In fact, the PPM raised approximately $7,594,965.00. Upon information and belief, throughout this process, SLF had knowledge of the money that was raised and its contribution to the success of the PPM.

**F.    Audit Failures**

23.    SLF failed in several respects to meet the standards set by the PCAOB and GAAS. Among other failures, SLF failed in planning and execution of the audit. In fact, it appears SLF never even received records sufficient enough to complete an accurate audit. In addition, SLF failed to appropriately address the complexity of an international business and the pending RTO.

Moreover, SLF knowingly did not address the real risk factors that were known at the time of the audit.

24.     In its rush to push the audit forward, SLF disregard several red flags and failed to adjust its audit to apparent risks. Specifically, the following known risk factors are completely disregarded in SLF's Audit Opinion:

- Serious risks due to the cyclical nature of livestock market (both in the price of the livestock and the price of feed);
- SCLI management has no experience in operating a publicly traded company;
- Extensive capital requirements for the expansion into manufacturing fertilizer;
- Substantial competition from larger livestock companies;
- Limited nature of SCLI's operating history;
- Impossibility of implementing required internal controls based on the cash-nature of the business;
- Potential risk of losing key employees;
- Admission that SCLI would likely not be able to meet SEC requirements;
- Failure to properly withhold up to $4.4 million in taxes;
- Threat of disease and the extreme impact disease would have on the business;
- PRC's power to regulate prices; and
- Licensing and permit failures.

25.     SLF intentionally and recklessly did not consider these risk factors for its own gain.

26.     At a basic level, influenced by the conflicted position of the lead auditor, SLF did not properly plan, staff, or allow for sufficient time to conduct the SCLI audit. In addition, SLF relied too heavily on third parties located in China and neglected to perform the appropriate work itself. Upon information and belief, SLF was not licensed to conduct an audit in the PRC. Finally, SLF intentionally disregarded known risk factors making SLF's actions fall far outside GAAP and PCAOB standards.

## G.     Depletion of Assets and Going "Dark"

27.     From April 21, 2010 to January 25, 2011, SCLI executives began transferring the millions of dollars raised in the public offering out of the company. These transfers included the

movement of money to non-company accounts, family members, as well as misappropriating money for payments of personal expenses (e.g., lawn service, maid service, and condominium maintenance fees.)

28.     In addition, SCLI executives transferred common stock to an off-shore company for no consideration. Specifically, the last 10-K filed on February 7, 2011, shows Shu Mei held 4,386,438 shares (61.4% of SCLI) but there is no record of any consideration for the transfer of this stock.

29.     Throughout this period, SLF continued as SCLI's auditor and assisted, encouraged and furthered the scheme by preparing and distributing false and misleading audit reports and signing off on filings with the SEC on August 2, 2010 (Consent to Amendment No. 1 to Form S-1), August 25, 2010 (Consent to Registration Statement to Form S-1), September 30, 2010 (Consent to Amendment No. 6 to Form S-1), December 17, 2010 (Consent to Amendment No. 6 to Form S-1), and February 7, 2011 (Consent to Amendment No. 7 to Form S-1). The false and misleading audit reports and signing off on SEC filings were a significant factor in concealing the movement of funds out of the company. SLF knew or with reasonable diligence should have known that funds were being misappropriated and diverted from the company.  If SLF would have operated as a prudent auditor and complied with the proper standards, SLF would have revealed the wrongdoing and prevented the misappropriation and diverting of millions of dollars out of the company.

30.     On August 15, 2011, SCLI went "dark" and filed a Form 15-12G terminating its responsibility to continue making filings with the SEC.

### V.     STATUTE OF LIMITATIONS DEFENSES

#### A.     Discovery Rule / Inquiry Notice / Equitable Tolling

31.     The Receiver was appointed by the Court of Chancery in the State of Delaware. Plaintiff filed the original action in this matter on July 15, 2016 in the United States District Court,

Southern District of New York on behalf of the Receiver who was appointed on January 17, 2014. The matter was dismissed based on jurisdictional grounds on June 14, 2017. The New York action was timely as Plaintiff did not discover, and could not with the exercise of reasonable diligence have discovered until more recently, Defendant's participation in the SCLI's activities and the true nature of the injury suffered. Moreover, Defendant's wrongful acts were inherently undiscoverable. Plaintiff also asserts the doctrine of equitable tolling.

32.     Pursuant to 10 *Del. C.* §8118, this action is being commenced within one year after the dismissal of the New York action and is thus timely and not barred by the statute of limitations.

## VI.     CAUSES OF ACTION

33.     For each of the following causes of action, Plaintiff incorporates by reference and reasserts the allegations above as if fully set forth below.

**COUNT 1:     Breach of Contract**

34.     Defendant contracted with SCLI to perform audit functions and produce and audit opinion. SCLI relied on Defendant to perform under the contract.

35.     Defendant wrongfully breached the contract established during the course of its business relationship with SCLI by not providing a reliable audit opinion. Instead, Defendant produced the false Audit Opinion that knowingly portrayed SCLI in a false light.

36.     Defendant's actions directly injured SCLI and therefore the SCLI receivership estate with a monetary loss greater than the Court's jurisdictional limits.

**COUNT 2:     Negligence/Gross Negligence**

37.     Defendant owed a duty to SCLI that required Defendant to exercise the ordinary care, skill, or diligence that a certified public accountant of ordinary skill and knowledge commonly possesses.

38.     Defendant's negligent acts or omissions breached that duty to SCLI when Defendant knowingly provided the false Audit Opinion. Defendant's breach of this duty proximately caused an injury to SCLI and therefore the SCLI receivership estate by causing the misappropriation of millions of dollars from the SCLI receivership estate. As a result of Defendant's actions, SCLI and therefore the SCLI receivership estate suffered millions of dollars in damages.  Defendant's aggravated conduct is apparent through conducting an international audit without the proper licensing and without even the slightest diligence before offering its Audit Opinion constituted gross negligence. Accordingly, the Receiver is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

**COUNT 3:     Aiding, Abetting, or Participation in Breaches of Fiduciary Duties**

39.     The directors and officers of SCLI owed fiduciary duties to SCLI and therefore owed fiduciary duties to the SCLI receivership estate. These directors and officers breached their fiduciary duties by causing SCLI to engage in an illegal scheme that enabled the misappropriation of millions of dollars from SCLI and the SCLI receivership estate through the RTO, causing SCLI and the SCLI receivership estate to suffer millions of dollars of losses.

40.     Defendant knowingly aided, abetted, and/or participated in these breaches of fiduciary duties through issuing the Audit Opinion. Defendant knew that the directors and officers of SCLI owed fiduciary duties to their respective investors, and Defendant was aware that these directors and officers were breaching their fiduciary duties through the RTO.

41.     Defendant also knew that it was aiding, abetting, and/or participating in these breaches of fiduciary duties by the conduct alleged herein. The directors' and officers' fiduciary breaches and Defendant's participation in these breaches were a proximate cause of actual damages to SCLI in the amount of millions of dollars.

42.     Defendant knew or should have known that its aiding, abetting, and/or participation in these breaches of fiduciary duties would result in extraordinary harm to SCLI and therefore SCLI receivership estate. Accordingly, the Receiver is entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this Court.

**COUNT 4:     Aiding, Abetting, or Participation in a Fraudulent Scheme**

43.     By its conduct described herein, Defendant knowingly aided, abetted, and/or participated with the various directors and officers of SCLI in a fraudulent scheme.

44.     In particular, Defendant's services substantially assisted a fraudulent scheme that further assisted SCLI in misappropriating millions of dollars from the SCLI, causing SCLI to suffer millions of dollars of losses.

45.     As a result of this conduct, Defendant is directly liable for fraud, and its actions, in combination with the actions of its SCLI's directors and officers are a proximate cause of actual damages to the Receiver in the amount of millions of dollars.

**COUNT 5:        Fraudulent Conveyance Under the Uniform Fraudulent Transfer Act – Constructive Fraud**

46.     During the time Defendant was retained by SCLI, Defendant received fees and transfers from SCLI. Defendant did not provide reasonably equivalent value in exchange for any of the transfers.

47.     Moreover, the transfers to Defendant were made without fair consideration in that Defendant, through its failings in the Audit Opinion, provided nothing of value in return for the transfers.

48.     At the time of the transfers to Defendant, SCLI had outstanding debts, including a sizeable tax debt. Upon information and belief, SCLI's outstanding debts were at a level beyond SCLI's ability to pay them as they became due. Accordingly, upon information and belief, SCLI was insolvent at the time it made transfers to Defendant.

49.     Pursuant to the Uniform Fraudulent Transfer Act, the Receiver, on behalf of the receivership estate, may avoid the transfers to Defendant. The transferred property, its proceeds, or substitute property of equivalent value constitutes receivership property.

50.     Therefore, Plaintiff is entitled to recover from SLF the full amount of any fraudulent transfers that third parties received from SCLI, either directly or indirectly. Plaintiff is also entitled to recover attorneys' fees and costs for its claims against Defendant. As a result, Plaintiff requests reasonable attorneys' fees and costs for prosecuting its fraudulent-transfer claims against Defendant.

**COUNT 6:    Unjust Enrichment**

51.     Defendant received fees from SCLI without providing any value in return. Defendant obtained these fees at the expense and to the detriment of the SCLI receivership estate.

52.     In obtaining fees this way from SCLI, Defendant unjustly enriched itself. Accordingly, Defendant should be required to make restitution to the receivership estate of the fees and other property it received from SCLI.

## VII.    ACTUAL DAMAGES

53.     SCLI has suffered the loss of millions of dollars as a result of the diversion and misappropriation of funds from SCLI and millions of dollars of losses in the RTO – all under Defendant's watch as the auditor.

54.     This loss was proximately caused by Defendant's wrongful conduct and its conjunction with SCLI and others as described herein. Additionally, Defendant is liable for all damages caused to SCLI during the time period when Defendant participated in concealing the true nature of SCLI.

55.     In addition, Plaintiff is entitled to recover its just and reasonable attorneys' fees, subject to Court approval, for it would be inequitable not to award such fees to Plaintiff. Plaintiff has retained the undersigned attorneys and has agreed to pay them reasonable fees for their work.

## VIII.   PUNITIVE DAMAGES

56.     Plaintiff's injuries resulted from Defendants' gross negligence, and malice, which entitles the Receiver to exemplary damages in an amount necessary to punish Defendant, and to deter similar conduct by others in the future.

## IX.     CONDITIONS PRECEDENT

57.     All conditions precedent to filing this Complaint has been met.

## X.      JURY DEMAND

58.     The Plaintiff demands a trial by jury.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff pray for judgment in their favor and against Defendant as follows:

A.      An order declaring Defendant breached the contract with Plaintiff, have aided and abetted the breach of fiduciary duties, have aided and abetted a fraudulent scheme, have orchestrated a fraudulent conveyance, and have been unjustly enriched;

B.      An order directing Defendant to pay Plaintiff monetary, compensatory, consequential, liquidated, and punitive damages;

C.      Attorney fees and litigation expenses, to the extent permitted by contract or law;

D.      Pre- and post-judgment interest, to the extent provided by contract or law; and

E.      Such other and further relief, in both law and equity, as the Court deems appropriate.

Dated:  December 28, 2017            Respectfully submitted,


HOGAN◆McDANIEL

*/s/Daniel K. Hogan*
Daniel K. Hogan (DE # 2814)
1311 Delaware Avenue
Wilmington, Delaware 1980
Telephone: (302) 656-7540
Facsimile: (302) 656-7599
Email: dkhogan@dkhogan.com

-and-

**VANACOUR PERKINS PLLC**

Kevin Perkins
State Bar No. 24053420
Jason Vanacour
State Bar No. 24073250
14675 Midway Road, Suite 100
Addison, Texas 75001
Phone: (972) 646-3999
Fax: (972) 692-0509

*Pro Hac Vice to be Filed*

***COUNSEL FOR THE RECEIVER***